[No. G045920. Fourth Dist., Div. Three. Oct. 16, 2012.]

In re the Marriage of CHRISTINA ADAMS and JACK A.
CHRISTINA ADAMS, Respondent, v.
JACK A., Appellant.

1544

## COUNSEL

Hammers & Baltazar and Barbara K. Hammers for Appellant.

No appearance for Respondent.

## OPINION

**IKOLA, J.**—Jack A. (father) appeals a postjudgment order awarding sole legal custody to Christina Adams (mother) of the parents' only child, J. (now 14 years old). Because the court erred by refusing to remove an Evidence Code section 730 evaluator for bias and then relying on the evaluator's biased report in awarding mother sole legal custody of J., we reverse the custody modification order.[1] We also hold the court erred by denying father's motion for the appointment of a special master and father's request for a determination of the reasonableness of the section 730 evaluator's fees. We remand the matter to the trial court for further proceedings consistent with this opinion.

### FACTS

In this case, the parties disagree fundamentally on how best to raise their highly intelligent son, J., who was diagnosed at a young age with Asperger's syndrome, a form of high functioning autism. The parents care deeply for their son, but hold diametrically opposed views on the extent of his disabilities and on the efficacy of certain types of autism treatment. Mother has written a published book on autism, gives lectures on the subject, helps other families obtain services for their children with autism, and plans to write several more books about autism. Father is a special education attorney and has a master's degree in psychology.

---

[1] All statutory references are to the Evidence Code unless otherwise stated.

In 2008, when the parents divorced, they agreed, in a stipulated judgment pursuant to Code of Civil Procedure section 664.6 (the judgment), to submit future disputes about matters involving J. (such as custody and education) to a special master selected in accordance with the judgment. The judgment provided: (1) the special master would be a licensed mental health professional; (2) if a party disagreed with the special master's decision, the party could seek the court's intervention; and (3) the special master would report any unresolved conflicts to the court. Under the judgment, the parties shared joint legal custody of J. and divided their physical custody of him based on a designated schedule.

In January 2009, mother discontinued any direct communication with father and advised him she had asked her fiancé to be "an intermediary, whenever possible, for ALL communications with you."

In 2010, a dispute arose between the parents as to which middle school J. should attend in the fall, after his graduation from Kaiser Elementary School in the Newport-Mesa Unified School District (NMUSD). Mother had recently moved to Laguna Beach with her new husband.

In a March 16, 2010 e-mail message to mother, father asked her to comply with the judgment's special master provisions so that a special master could be selected with enough time to gather information to make a school recommendation for J. Father stated: (1) he believed J. should attend Ensign Intermediate School (Ensign) in NMUSD, and (2) J. had been telling father for several months that mother wanted to transfer J. to the Laguna Beach Unified School District (LBUSD).

Two days later, in an e-mail reply to father, mother's husband said he and mother had not yet decided their school preference for J. Five days later, mother e-mailed (without copying father) a regional special education director and stated she (mother) planned to enroll J. in Thurston Middle School (Thurston) in Laguna Beach. Two days later, mother's husband e-mailed father a message from mother, asserting that father had failed to provide them with adequate information about why father preferred Ensign. Mother complained that the "only information" father had given was that (1) LBUSD's special education department was difficult to work with, and (2) J. would be better off at a school where he knew some of his peers.

On May 27, 2010, mother resorted to the legal system by filing an order to show cause (OSC) seeking sole legal custody of J. She asked the court to order an evaluation under section 730 to determine whether father "is capable of being an effective parent without supervision." She also asked the court to modify the judgment's special master requirement, asserting that the parties'

past use of special masters had "been to no avail." Mother declared: (1) the most pressing concern was the choice of a middle school for J.; (2) she favored Thurston and father preferred Ensign; and (3) she resided in Laguna Beach close to Thurston.

Mother further declared: J. "has significant medical, psychological and educational needs which require a myriad of outside services. [J.] is on a medically prescribed special diet and follows strict medical protocol to ameliorate his behaviors and to improve his overall health and well being. However, [father] often feeds [J.] foods that are not on his medically prescribed diet, causing him documented negative adverse effects." Furthermore, "[c]ontrary to [J.]'s best interests, [father] will not permit any of [J.'s] service providers to come to his home." (In a subsequent declaration, mother stated that behavioral therapists from the Center for Autism and Related Disorders, Inc. (CARD), visit her home four days a week. At trial mother testified that without his diet and medications, J. is moderate to severe on the autism spectrum.)

Father responded with his own OSC, seeking the appointment of a special master pursuant to the judgment. Father listed the names of three "mental health practitioners who act as special masters." He declared he had contacted mother five months earlier to ask her to participate in agreeing to a special master concerning the choice of a school for J. He declared J. had been enrolled in NMUSD since the boy was three years old.

Father further declared: Mother "feels it necessary to maintain a staff of support personnel at her residence to assist her with" J.[2] Mother "has turned our son's disability into a cottage industry. She spends her time researching treatment methodologies for autism that often have little or no proven validity. For example, [mother] has for several years fed [J.] camel's milk as a purported treatment for autism. [Mother] stopped taking [J.] to his previous pediatrician of [seven] years [because the pediatrician] was critical of [mother's] insistence upon camel's milk as a treatment for autism." Mother now takes J. to a "naturopathic doctor." Several allergy tests had been "administered to [J.] over the years," but no test (to father's knowledge) had shown J. to be allergic to dairy products. NMUSD "is much more active in providing programs for students with autism than is" LBUSD. (In a subsequent declaration, father declared the parties' former special master had successfully facilitated decisionmaking: "[D]uring the entire time that Dr. Johnson served as special master, there was not a single issue submitted to him for resolution that subsequently required either party to seek court intervention.")

---

[2] J. received CARD services between the ages of three and seven. When J. was over 10 years old, CARD therapists compiled direct observation data which showed J.'s rate of negative behavior was higher in mother's care than when he was with father. CARD recommended renewed therapy for J. and parent training.

In a July 21, 2010 stipulated order regarding a section 730 evaluation, the parties agreed that: (1) the parties and J. would submit to a full psychological examination by David J. Jimenez "for the purpose of making a recommendation as to child custody"; (2) Jimenez's report would "be admitted into evidence subject to cross-examination" at any custody hearing; and (3) the parties would divide the cost of Jimenez's fees equally.

In an August 2, 2010 stipulated order on mother's OSC, the parties agreed that Jimenez would serve as the special master pursuant to the parties' stipulated divorce judgment. The parties further agreed *not* to submit issues to Jimenez in his capacity as special master until he had completed his section 730 evaluation, *unless* the parties stipulated in writing and Jimenez agreed "to so act."

In a separate August 2, 2010 stipulated order concerning a school recommendation, the parties agreed that: (1) Jimenez would recommend a school for J. before addressing other issues and prior to completing his section 730 report, and (2) the parties would place J. in the school recommended by Jimenez, but the recommendation would be without prejudice to either party and subject to change after the section 730 report was complete.

On September 2, 2010, Jimenez recommended that J. be enrolled at Thurston.

*Father's Motion to Stay the Section 730 Evaluation and Remove the Evaluator*

### A. *Father's Removal Motion and Declaration*

On December 20, 2010, father filed an ex parte application to stay the section 730 evaluation and remove Jimenez as the evaluator. (We will sometimes refer to this application as father's removal motion.) Father asked the court to stay the section 730 evaluation to prevent the parties from incurring any more fees for "an evaluation of limited or no value," and stated "Jimenez should not write a report for which he may not be paid." Father declared Jimenez had acted outside the scope of a section 730 evaluation and demonstrated a bias in favor of mother. Specifically, father declared:

(1) *Father's Boat.* In an interview, father told Jimenez he enjoyed boating with J., had recently bought a boat, and had taken progressively longer boat trips with J. with the plan of going to Catalina when conditions were suitable. Father had operated boats for over 40 years, made over 30 trips to Catalina without mishap, and had taken J. with him on boat trips to and from Catalina. In August 2010, Jimenez wrote father's attorney saying: (1) Jimenez had

received a voice mail message from mother expressing concern about father's taking J. to Catalina on his boat and (2) Jimenez had contacted the harbormaster at the Marina del Rey harbor, who "recommended that a crossing to Catalina should not be attempted in a boat of less than 25 feet, contingent on factors such as water and weather conditions, nautical skill of the boat operator, knowledge of safety procedures, type of boat and boat manufacturer, etc. [¶] Without inquiring as to [father's] skill as a boat operator, the type or manufacturer of [his] boat, or the weather or water conditions under which a trip to Catalina might be attempted, Dr. Jimenez stated in his . . . letter that he was 'strongly discouraging [*sic*] both parties to refrain from this type of activity, or any other type of activity with [J.] which could be accidentally interpreted by others as child endangerment as defined by California Penal Code [section] 273[a, subdivision (a)].' " Father complied with Jimenez's discouragement and did not take a boat trip to Catalina with J.

(2) *Life Mask.* In October 2010, about a week before J.'s 13th birthday, J. and father began making a "life mask"—"intended to be a remembrance of [J.] becoming a teenager"—using quick-setting plaster and gauze. Jimenez phoned father to say mother had asked Jimenez to instruct father to stop creating a life mask of J. Father and J. stopped making the life mask.

(3) *Internet.* On November 12, 2010, J. disabled the content filter on a computer at father's house and accessed adult Internet sites late at night when father was asleep. The next morning, father discovered J. had printed a picture of a naked woman. Father e-mailed mother about the incident before returning J. to her that evening and said he "had curtailed any further [I]nternet access by [J.] at [his] house as a result of this incident."

(4) *Father's Knife Collection.* On November 29, 2010, in the late afternoon, Jimenez phoned father and said he (Jimenez) was parked in front of father's house and wanted to "look at the browsing histories on computers used by [J.], inspect [father's] knife collection and talk with" father without J. present. Father drove home as requested and let Jimenez examine the browsing histories of computers that might have been used by J.

Father has a "plastic container containing numerous knives of different kinds . . . accumulated over the years." Jimenez inspected each knife. Father offered to "get rid of the collection" if Jimenez thought the knives were a problem. Jimenez said the knives were not a problem, but father should lock them up. Father told Jimenez that J. owns pocket knives and showed Jimenez "the drawer in [J.]'s bedroom where he usually keeps his pocket knives. Dr. Jimenez looked at the pocket knives in [J.]'s drawer and said he was not concerned about them." At the time, J. was 13 years old and had owned pocket knives for at least three years. J. had "qualified for the possession of

pocket knives on Boy Scout campouts by demonstrating he knows and observes the rules associated with safe and responsible pocket knife use."

Jimenez asked whether father had any firearms in the house. Father affirmed he did not. Father had previously given Jimenez a copy of father's declaration under penalty of perjury stating that he had no firearms in his house and there had been no firearms in any house in which father had resided for at least the last 10 years.

Jimenez wrote father's attorney recommending that father's knife collection be secured from J.

Just three days later, Jimenez "asked to see where the knife collection was kept. [Father] showed Dr. Jimenez the cabinet where the knife collection has been for the last [four] years and explained to him that [father] had not yet had an opportunity to install a lock on the cabinet. [Father said he] was in the process of finding an appropriate cylinder lock to install on the cabinet door."

The next day, Jimenez wrote father's attorney that father's "failure to put [the] knife collection under lock and key" had caused Jimenez " 'dismay and disappointment.' Dr. Jimenez referred to [J.]'s behavior in his letter as being 'unpredictable' with 'poor judgment, and poor impulse control.' Dr. Jimenez stated that it was his 'informed belief that these unsecured knives could pose a very serious risk to this thirteen year old minor, or others.' " "Jimenez wrote: [¶] 'I am hereby directing Mr. [A.], by way of his counsel, to lock these knives in such a manner that they do not pose a risk, and further to secure these knives in a location not known to [J.] Mr. [A.] should provide this child custody evaluator with photographs by fax NO LATER THAN 5:00 P.M. ON DECEMBER 6, 2010, with regard to the safety measures he has taken, accompanied by a written statement documenting these actions, and an explanation of the reason or reasons that he had chosen not to take action in this regard following my November 29, 2010 home visit.' " Jimenez also wrote that the "small pocket knives" he had inspected in J.'s bedroom "did not cause [him] any concern."

That afternoon, father "installed a cylinder lock on the cabinet where the knives were kept . . . and immediately emailed photographs to Dr. Jimenez showing the lock installation. [Father] further explained in an email to Dr. Jimenez that the reason the lock was not installed earlier was because [father] did not realize that [Jimenez] considered the installation of the lock to be a matter of such urgency and that [father] had planned to do the installation over the weekend."

Three days later, Jimenez e-mailed father to ask "what precautions [father] had made regarding securing the key that opened the lock of the cabinet

where the knife collection was now stored. [Father] responded by email informing Dr. Jimenez that [father] would keep the key to the cabinet in a separate safe with a combination lock as an additional layer of security."

(5) *J.'s Knife*. Based on Jimenez's verbal and written statements he was not concerned about J.'s pocket knives, father "did not take or secure [J.]'s pocket knives [and] did not attempt to stop [J.] when he took one of his pocket knives from [father's] house to . . . mother's house on Saturday, December 11, 2010." J. had told father that mother had seen this pocket knife before and was " 'fine with it.' " Father e-mailed mother the next morning, informing her that J. had taken a pocket knife to her house and asking her "to please make sure that the pocket knife not be inadvertently left in [J.]'s sweatshirt pocket where it might accidentally end up at school with him."

Around 10:15 p.m., Jimenez phoned father and instructed him to appear at Jimenez's office "the next day to explain the circumstances surrounding [J.] taking a pocket knife to his mother's house the previous day." Jimenez stated the requirement was " 'non-negotiable.' " The next day, father traveled to Jimenez's office, which was located 50 miles from father's home and office. Jimenez showed father "an enlarged picture" of J.'s pocket knife. Jimenez read father the definition of criminal child endangerment from Penal Code section 273a, subdivision (a). Jimenez stated he was considering reporting father to child protective services for suspected child endangerment.

(6) *Safety Plan for Father's House*. The next day, Jimenez e-mailed father: "Jack. As I indicated last night I am directing you to carefully walk through your house today including the rear yard, garage, driveway, etc. with a different perspective, identify potential safety hazards for [J.], identify the actions needed to rectify these, and prepare a 'safety plan' and fax it to me by the end of the business day. Include hazards that may be in the boat and in the garage such as solvents, improperly stored flammable containers, knives, etc. I would recommend that you consult your attorney before sending me your final plan. PLEASE FAX IT TO ME. Thank you. Dr. Jimenez."

The next day, father faxed Jimenez a letter expressing concerns about Jimenez intervening in father's activities with J. and accepting ex parte communications from mother and her attorney in the course of the section 730 evaluation. Father also e-mailed Jimenez that father "could not possibly comply with his direction to submit a final safety plan by the end of that business day." Father then faxed Jimenez "a letter informing him that, on the advice of counsel, [father] would not be submitting a final safety plan of [father's] residence and that he should contact [father's] attorney with any questions."

Father declared that J. has never misused materials such as household solvents and knives in the past and that it did not appear Jimenez requested mother to conduct a similar safety inspection of her home and yard.

(7) *Evaluator's Bias.* Father declared: Jimenez's strongly confrontational communications had caused father to feel "reluctant to communicate openly with him about anything that could conceivably be misconstrued to portray [father] in a negative light." Since August 2010, when Jimenez referred to Penal Code section 273a, subdivision (a) in discouraging father from taking J. on a boating trip to Catalina, "Dr. Jimenez's actions have demonstrated an escalating willingness to openly intervene . . . at [mother's] request . . . ." Father stated: "Dr. Jimenez has demonstrated extreme bias against me and in favor of [mother] even before his evaluation is complete. . . . I do not believe Dr. Jimenez can be neutral as he has clearly demonstrated a preference and alliance with [mother] in this process."

### B. *Father's Counsel's Declaration*

Father's counsel declared Jimenez had violated, inter alia, California Rules of Court, rule 5.220(h)(1) by exhibiting bias and aligning himself with mother. "Additionally, Dr. Jimenez has violated his own stated protocols by examining documents not provided to [father's] counsel after stating in writing he would refuse to consider any document not copied to the other [party's] counsel first." Prior to making his school recommendation, Jimenez had interviewed J. in mother's home, but not in father's home. Prior to the school recommendation, Jimenez conducted psychological testing of father, but not of mother. Jimenez's billing revealed that prior to the school recommendation he had spent 5.75 hours in individual sessions with mother, compared with 3.75 hours with father, and that after the school recommendation, he spent 8.75 hours with mother and her husband, compared with 5.25 hours with father. Counsel declared that Jimenez's demands on father violated California Rules of Court, rules 5.220(h)(1), (5), and (9), and 5.225(d)(14), (16), and (20). Counsel also asked the court to determine if Jimenez's billing was reasonable under section 730 and California Rules of Court, rule 5.220(d)(1)(D), arguing Jimenez had charged the parties inflated amounts, such as $375 for phoning the Marina del Rey harbor master and $1,625 for downloading e-mail messages on four days.

### C. *Father's Expert Witness's Declaration*

The expert discussed in detail the following "areas of concern": "the use of interim reports (or directives), the lack of an initial defining of the scope and purpose of the evaluation, the lack of respect with which the father appears to have been treated, the dual roles [[as an evaluator and special master)]

engaged in, and the apparent bias and unequal treatment of the mother and the father." The expert stated: "The ultimate question . . . is, '*If there is merit to the questions and concerns raised here, is this evaluation process so tainted that the product of it may very well not be helpful to the Court, the parties, and counsel?*' "

### D.   *The Court's Ruling*

The court scheduled a hearing and denied father's motion pending the hearing.

*Mother's Opposition to the Motion to Stay the Evaluation and Remove the Evaluator*

### A.   *Mother's Declaration*

Mother declared: She is "under no misconception that Dr. Jimenez is acting as a Special Master during the evaluation process." She and father "stipulated to Dr. Jimenez taking on the role of Special Master in late summer 2010 in order to determine the best school placement for our son." The parents "were repeatedly informed that Dr. Jimenez's role as a Special Master would end once the choice of school determination was made." At a meeting in November 2010, Jimenez made it clear he was not acting as a special master.[3]

(1) *Life Mask.* Mother declared J. phoned her "that night, pleading with [her] to stop [father] from making a second attempt at creating a Lifemask," because J. "was afraid he could not keep his eyes closed for thirty minutes, in order for the compound to set." Because mother did not "wish to do anything confrontational, yet felt a responsibility to address this traumatizing situation, [she] called Dr. Jimenez so he could gather whatever information he wished."

---

[3] Mother's declarations seem to assert that the parties agreed Jimenez would serve as a special master for purposes of the school selection for J. This assertion is unsupported by the record. On August 2, 2010, the parties stipulated and the court ordered that Jimenez would serve as the special master *after* the section 730 evaluation was completed. Indeed, in mother's responsive declaration to father's OSC, she argued that because the parties had stipulated (at her suggestion) to Jimenez conducting a section 730 evaluation and recommending a choice of school for J., "there are currently no issues for a special master" and father's request for one was therefore "moot." In any case, the incidents described in father's removal motion occurred after Jimenez made his school recommendation (with the exception of the Catalina trip discouragement).

As to the stipulated order that Jimenez would serve as a special master after completion of the section 730 evaluation, the court vacated the order at the hearing on father's motion to remove the evaluator, stating: "A special master has to have the confidence of both parties. That is not the case."

(2) *Father's Boat.* Mother declared that "just weeks prior to [father's] intended departure, our son leapt into the water of the harbor without a life jacket" and father "was obviously not paying close attention to him."

(3) *J.'s Knife.* Mother declared the enlarged photo of the knife was taken by her "husband, a former U.S. Army intelligence officer, who set a ruler in the photo so the viewer could judge the size accurately."

(4) *Safety Plan for Father's House.* Mother declared that Jimenez, having visited mother's home without notice and interviewing mother and her husband, knew they "had already implemented a safety plan. [Jimenez] would have known that [mother's] husband's Army gun and knives were properly stored, locked, secured, and concealed, that all knives (other than difficult to conceal kitchen knives) were properly secured, that all potentially dangerous chemicals and other items were properly secured and that [their] keys are kept in a locked key box to which [J.] does not have access."

### B. *Mother's Counsel's Declaration*

Father is a convicted felon barred from owning firearms. When father waited 15 hours before e-mailing mother that J. had a knife, father "acted with deliberate indifference to the child's safety and the welfare of [mother] and her family which includes her young step daughter." "With the stipulated exception of making the school choice decision, Dr. Jimenez has been extremely clear that his current role has been as custody evaluator and not as special master."

### C. *Mother's Expert Witness's Declaration*

The expert stated, inter alia, there was "no way to judge [Jimenez's] work without his report, as the report is the culmination of his efforts." Psychologists "have an ethical responsibility to take steps to insure the safety of those with whom [they] work professionally." The parties signed Jimenez's contract which states, " 'The parties and counsel understand that the evaluator is morally, ethically, and legally required to take steps to ensure the safety of the children, the parties, and others, which may include contacting the authorities.' "

*Father's Reply*

On December 29, 2010, father's counsel asked Jimenez to voluntarily recuse himself. The next day, Jimenez wrote father's counsel stating: (1) father and his attorney were not to communicate with Jimenez and (2) Jimenez would interpret any communications from them as "intrusive and an

attempt to delay or otherwise interfere with [Jimenez's] completion of" the section 730 report. Father declared that Jimenez placed no such limits on his communication with mother and "even had an individual interview" with mother that day. Father declared that Jimenez, on January 10, 2011, in response to *mother's counsel's* request, offered to release his final report to only one party upon receipt of one half of his bill. Also in January 2011, Jimenez wrote father's counsel a letter, taking "issue with a complaint that [father] filed with the Board of Psychology regarding [Jimenez's] conduct."

(1) *Father's Boat*. Father declared the "only time [J.] ever fell in the water when he was boating with [father] was when he once tried unsuccessfully to jump from the shore to the dock when [they were] returning to the boat after eating lunch. The depth of the water was approximately 3 feet and [J.] was never in any danger of any kind."

(2) *J.'s Knife*. Father declared it "is undisputed that [J.] has owned and possessed pocket knives for several years without incident." "The pocket knife in question cost approximately $5.00 and was purchased by [J.] with his weekly allowance. There has been no suggestion or allegation that there is anything about this particular pocket knife that renders it illegal to own or possess by [J.] or any other 13-year-old boy under any of the circumstances or locations involved."

Father declared mother "grossly exaggerate[s]" J.'s disability and insists J. "is incapable of handling even the most modest tasks, such as walking two blocks to school." Father declared there "has been no medication prescribed by [J.'s psychiatrist] which [father has] failed to consent to in writing when requested." Father denied having any firearms in his residence. He declared the criminal conviction referred to in mother's counsel's declaration "occurred more than 30 years ago" and had been "determined by the State Bar of California to be one that was not a crime of moral turpitude and . . . did not prevent [him] from being admitted to the State Bar 27 years ago."

*The Court Denies Father's Motion to Stay the Evaluation and Remove the Evaluator*

Three weeks after father filed the motion to stay the evaluation and remove the evaluator, the court held a hearing on the matter. At the hearing, father's counsel sought to put her expert witness on the stand, but the court stated it did not "anticipate conducting an evidentiary hearing" on the motion and would instead decide the matter based on declarations and counsel's oral argument. The court stated Jimenez, in an "ex parte communication" to the court that morning, had submitted his section 730 report to the court, but did

not "want to give it to [the parties] until he had been paid."[4] The court had no "idea what [Jimenez's] recommendations are, because [it had] not opened his report."

The court, addressing the issue at hand, stated father believes "that Dr. Jimenez has gone well outside the perimeter of a [section] 730 evaluation and has become essentially sort of a special master here, making decisions, directing the parties to take certain actions and conduct, without their consent for him to engage in that role."[5] The court continued: "Quite frankly, [father] is right. . . . I was surprised to see the things that Dr. Jimenez had done while being tasked to perform a completely neutral and objective child custody evaluation. [¶] Frankly, I don't know where he got off purporting to tell [father] whether he could take his son on a boating trip or not. I think it would have been perfectly appropriate for him to include that in his evaluation if he thought that there was something inappropriate about it. Perhaps even to alert [mother] or somebody if he felt that there was some risk involved. [¶] [W]hen he does things like demand a safety plan for [father's] knife collection, shows up at his home and demand inspection, he is really outside the scope of a [section] 730 evaluation. If nothing else, he has lost his objectivity and he is no longer evaluating. . . . [¶] Now, what is the consequence of that? My soft tentative here is that the consequence proposed by [father] is just too draconian. I'm not inclined to waste all of the time, the effort, and the expense that is put into this [section] 730 evaluation. [¶] [T]o the extent that Dr. Jimenez has lost his objectivity, . . . I think that bears on the validity of his recommendation. I believe it is an appropriate area for cross-examination. I think it is an appropriate area for [father] to argue that [Jimenez's] recommendations are slanted, that they shouldn't be accepted. [¶] . . . But I don't think that what he has done here is sufficiently egregious to waste all of the effort and the time and the expense."

Father's counsel argued, inter alia, that "Dr. Jimenez was not using the balanced information gathering that he was required to do under the Rules of Court." As to the time and costs spent on the report, father's counsel argued that Jimenez began writing his report only *after* father filed his removal motion, and that Jimenez also did most of his work and billed much of his nearly $42,000 fee after father's removal motion was filed. Father's counsel further argued that, to put Jimenez's report into evidence subject to cross-examination, would require her to get his file and depose him, which would be costly for father.

---

[4] Although Jimenez represented to the court that he had not given his report to the parties, mother's counsel stated later in the hearing that she had received the report that morning.

[5] The court misstated father's concern by saying Jimenez "direct[ed] the *parties* to take certain actions and conduct, without *their* consent for him to engage in that role." (Italics added.) The court may have focused more on the special master aspect of Jimenez's misconduct, as opposed to the evaluator's bias against father.

The court denied father's removal motion, stating: "I don't believe the conduct as set forth in the declarations is so egregious as to justify the removal of Dr. Jimenez as the [section] 730 evaluator at this point." The court reserved for later determination "the issue of the reasonableness of Dr. Jimenez's fee." The court ruled the section 730 evaluation could be released to the parties' experts and Jimenez's complete file made available to the parties within one week. The court continued the hearing on mother's OSC seeking modification of custody.[6]

*Subsequent Developments Prior to the Custody Hearing*

### A. *J.'s Psychiatrist*

Jimenez provided his section 730 report to the parties, along with complete copies of J.'s psychiatric treatment records, even though J.'s psychiatrist of two and one-half years, Prithpal Singh, had instructed Jimenez in writing to keep the psychiatric records confidential. As a result of Jimenez's breach of confidentiality, Singh discontinued her treatment of J.

Father declared that after Jimenez gave J's psychiatric records to mother, mother phoned Singh and objected to statements in Singh's notes that "could, in [mother's] opinion, be interpreted as not presenting [mother] as positively as she would like." Mother's counsel sent father's counsel a letter asking that Singh's notes not be disclosed to Debra Hill (J.'s new psychiatrist) "and that they be 'sealed on an immediate basis to afford [J.] a fresh start with his new doctor.' "

Mother declared she told Singh that she would not consent to Singh's releasing J.'s records or speaking with anyone about them. Mother determined Hill was best qualified to be J.'s new psychiatrist.

### B. *Mother Takes J. to Police Station to Lodge a Police Report*

Mother declared: "My worst fears are coming true. I have always supported and encouraged the relationship between [J.] and [father]. In preservation of my son's health and well being, I can no longer do so. The [section] 730 [e]valuation indicated that [father] has homicidal and suicidal ideations and fantasies." (We note that this last declaration by mother is *not* supported by the § 730 report.)

Mother declared she took J. to a police station to lodge a report because some of J.'s statements made her concerned for his safety in father's custody.

---

[6] References to custody in this opinion generally refer to custody of J.

The police report (attached to mother's declaration) stated: An officer took mother and J. to an interview room to discuss "a possible child abuse incident." Mother asked to speak with the officer in private. Outside J.'s presence, mother told the officer: (1) father has mental issues, is taking medication, and is a convicted felon; (2) during the past weekend, father had used his cell phone while driving his car with J.; and (3) J. said he had an argument with father and father threatened to hit him. The officer then spoke alone with J. Inter alia, J. said, "father has asked him to do activities that he does not want to do. [J.] said his father had asked him to join Boy Scouts or join a sailing club with him so they could have something to do together. . . . [¶] [J. said] he is allergic to dairy products and his father will often ask if he would like to eat dairy products." J. "said that sometimes his father will send text messages or check his email on his phone while driving. [J. said] that his father usually does this while stopped at a red light in the car." J. said he was at father's house the previous weekend and they argued about a teacher's note to father warning that J. was not taking notes in class. J. said father yelled at him and said he was going to hit him. Father pushed J. on the couch. J. did not sustain any injuries. J. said this was the only incident of violence.

## C. *Father's Reply*

Father declared: J. said mother was actively encouraging him to say he should be in her custody. Mother told J. that "a 'new law' " enables him to choose his custodial parent when he reaches the age of 14, that J.'s "life is now 'in Laguna Beach' and that [J.] should choose her as the custodial parent." J. repeated statements from Jimenez's report, even though father has never discussed the report with J. For example, J. said mother told him the evaluator concluded mother is a "great mother," father has serious judgment problems, and the only reason father disliked the evaluator was because he was critical of father. Mother told J. that father has mental problems, sees a psychologist, and needs therapy. Mother told J. that father has Asperger's syndrome and autistic tendencies.

Father declared J. might need to talk with his psychiatrist about the conflicting feelings he might be experiencing due to mother's urging him to choose one parent over the other and mother's taking J. to the police station to complain about father.

On April 14, 2011, about an hour before father was to pick up J. at mother's house, J. contacted father to say he wanted to stay with mother instead of father over the weekend. Father said he would talk with J. about it when father came to mother's house at 5:00 p.m. J. said he would not be at mother's house at 5:00 p.m. Mother had taken J. away from her home so he could not be picked up. Mother told father she would allow him to talk

with J. only "if the police were summoned to be witnesses." Father texted mother that "calling the police was unnecessary and not in [J.]'s best interests . . . ." After 5:15 p.m., mother returned to her house with J., "with the police arriving at her request."

### D. J.'s Interview with the Judge, Followed by the Parties' Stipulation on Physical Custody

On April 22, 2011, the trial judge interviewed J. alone in chambers. Prior to the interview, mother's counsel advised the court, inter alia, that J. no longer wished to spend time with father and had "expressed the fact that he is afraid of his father . . . ." Two weeks had passed since mother last allowed J. to see father. Father's counsel argued "that [J.] has been primed and prepared to say what he says . . . ."

In the interview, J. said he wished to see father only on some holidays or when mother was on vacation. When the court asked if anyone had coached J., the boy replied, "Well, not a whole lot." J. said he wanted to limit his time with father because father does not give him camel's milk and feeds him unhealthy foods like burgers and fries. J. said his Presbyterian youth group generally goes to In-N-Out Burger on Fridays, but Friday is father's custody day and father sometimes refuses to take J. there. J. explained, "That is kind of why I want . . . to live with [mother] full-time." When the court asked J. if he wanted to see Dr. Singh or transition to Dr. Hill, J. said he was not sure because Dr. Singh was "really nice, so [he] kind of liked seeing her . . . ." J. said father does not "really support school," but just helps him with homework and is "strict on it," and does not let him "do anything electronic" until J. finishes his homework. J. was a "C/B student," but planned "to drastically improve by high school." Father wants J. "to do social activities outside [J.'s] school district . . . ." Mother "altogether knows what is best for" him. J. noted that father does not like him having therapy, although "it has helped [him] a lot."

After the interview, the court told the parents, inter alia, that J. enjoys participating in his Presbyterian youth group and also attends a Unitarian church every Sunday with mother, but that father "doesn't seem to care much about it," and did not take J. to this type of activity. The court stated: "Sometimes it seemed as though [J.] was trying to recall what he was supposed to say, but that was just an impression. And he told me that he hadn't been coached or told what to say. As I talked to him and watched him, I thought maybe that was . . . an aspect of the Asperger's where . . . it takes him maybe an extra second or two to think about the question and understand it and think about the way to formulate his response."

The court stated it now had "the benefit of Dr. Jimenez's report" and J.'s interview, and was inclined to give significant weight to J.'s preference. The court noted Jimenez recommended in his section 730 evaluation that mother have "the final decision" on J.'s "middle school education; medical care, including dietary restrictions, psychiatric, and psychological treatment and" CARD, but that the parents should otherwise continue to share legal custody. The court suggested an appropriate physical custody schedule would be "alternate weekends and perhaps a midweek dinner visit for dad."

On May 4, 2011, mother filed an OSC seeking full legal *and* physical custody of J., with limited visitation for father. She also sought an increase in father's child support, as well as an order that father continue seeing his psychiatrist while commencing "psychotherapy with an emphasis on coparenting" for at least three months before any reunification efforts with J. Mother noted there had been a significant change in circumstances in that J. "is now allowing his intentions and desires to be known and addressed." She declared that during "the [section] 730 evaluation, Dr. Jimenez's objective, psychological testing found that [father] is afflicted with depressive symptoms, has poor judgment and presents a mild risk of suicide. He also found that [father] lives a very secluded life and has few friends." She declared father has been seeing a psychiatrist for over six years and takes "a myriad of psycho-tropic medications."

In response, father declared: Jimenez omitted from his report significant results of the Millon Clinical Multiaxial Inventory-III psychological tests he administered to the parties, thereby revealing the evaluator's bias and lack of objectivity. The omitted results showed mother was "exhibiting psychological dysfunction of mild to moderate severity," while father was "experiencing no disorder or a minimally severe disorder." Father does *not* take a myriad of medications. Father informed Jimenez in an interview that father was taking one-fourth of the normal adult dosage of a selective norepinephrine reuptake inhibitor that increases attention and decreases restlessness. Father no longer takes "this medication or any other medications with the exception of medications prescribed to control cholesterol and blood pressure." Father further declared that J.'s academic performance in school had declined significantly.

On June 2, 2011, the parties entered into a stipulated order that father would have physical custody of J. on alternate weekends and every Tuesday evening, as suggested by the court.

*The Court's Award of Sole Legal Custody to Mother and Refusal to Appoint a Special Master*

After a hearing on mother's request for sole legal custody and father's request for the appointment of a special master, the court granted mother's request and denied father's. The court granted mother sole legal custody based on its finding father "is unable to effectively coparent . . . ." The court identified the school selection issue as the "clearest example" of father's "complete refusal to act like a joint legal custodian." The court explained: "When a decision had to be made, he eschewed joint consideration, joint investigation, a meet and confer process, and immediately resorted to a legalistic procedure [by invoking the special master.] Was he within his legal rights to do so? Yes. But it is the antithesis of joint legal custody conduct."[7]

The court also based its conclusion on the following: "In my interview with [J.], he told me that he enjoys and benefits from his involvement in a church youth activity. His mother supports it. His father does not. His involvement just doesn't occur when it is dad's watch. [J.], almost tragically told me that he wanted minimal or no contact with father." In addition, the court confirmed for the record that it relied on Jimenez's report and found it to be "detailed and useful."[8]

The court found it was in J.'s best interest for mother to have sole legal custody. As to father, the court stated: "None of [father's] positive and

---

[7] The court's conclusion disregards that it was mother who instituted legal proceedings to resolve the school dispute and that the evidence conflicts on which parent was most responsible for the absence of joint consideration and conferencing.

[8] The court identified the following additional grounds showing father is incapable of coparenting: (1) he criticizes and intimidates CARD staff; (2) the court accepted Jimenez's assessment father believes "he can by himself address [J.]'s needs without the need for those additional services"; (3) father has "a history of being overbearing with professionals, teachers, and other professional providers" with whom he disagrees; and (4) father unilaterally sent J. to a summer autism camp offered by NMUSD. As to the third ground, we note that mother has allegedly terminated J.'s relationships with health care providers with whom she has disagreed. As to the first ground, we note that the record reveals father has complained to CARD about his perception CARD has not been neutral in this case, claiming: (1) a CARD supervisor told J. to make a list of reasons why he should be in mother's custody and (2) for purposes of Jimenez's school evaluation, CARD "present[ed] a strong written recommendation that [J.] attend the school preferred by" mother.

The court made additional findings. J.'s knife was "a small folding pocketknife," "a utility knife," "not a tactical weapon," and that it "is within the province of a father" "to teach an almost 14-year-old boy how to properly use and carry it." The evidence showed father was not at fault for J.'s exposure to adult content on the Internet and that father tried to address the problem properly. Jimenez acted improperly by "insinuat[ing] himself into the boating outing," although Jimenez was right that a Catalina crossing in a 15-foot runabout is inappropriate. At almost 14 years old, J., although he "apparently has strict dietary guidelines . . . also needs to live in the world."

constructive involvement with [J.] will be adversely affected by [mother] having sole legal custody. He can continue to provide beneficial and very helpful assistance in doing homework, particularly math" and "can continue to try and involve his son in quality activities such as boating and even if they share a common interest in pocket knives."

The court found Jimenez "did appear to step outside the limited role of a 730 evaluator." "But to the extent that he perceived his relationship to be broader than a narrow gathering of information and formulation of recommendations is understandable under the circumstances." The court ordered each party to pay one half of Jimenez's bill, because the parties had "failed to make a record on which the court could make a rational and reasoned determination that it would be appropriate to reduce Dr. Jimenez's outstanding bill."

Finally, the court stated it had no authority to delete the special master provisions from the judgment, because the parties had agreed to the requirement. But the court declined to appoint a new special master because, so long as mother has sole legal custody, there is no need for a special master.

## DISCUSSION

*The Court Erred by Denying Father's Motion for Removal of the Evaluator and by Awarding Mother Sole Legal Custody of J.*

Father contends the court erred by failing to stay the section 730 evaluation, failing to remove Jimenez as the section 730 evaluator, and relying upon Jimenez's report in awarding mother sole legal custody.

■ Over a century ago, our Supreme Court recognized the need for court-appointed "disinterested . . . experts who shall review the whole situation and then give their opinion with their reasons . . . regardless of the consequences to either litigant." (*Estate of Dolbeer* (1906) 149 Cal. 227, 243 [86 P. 695].) Section 730 serves this function by authorizing a court to "appoint a disinterested expert who serves the purpose of providing the court with an impartial report." (*Mercury Casualty Co. v. Superior Court* (1986) 179 Cal.App.3d 1027, 1032 [225 Cal.Rptr. 100].) "The job of third parties such as . . . evaluators involves impartiality and neutrality, as does that of a judge, commissioner or referee . . . ." (*Howard v. Drapkin* (1990) 222 Cal.App.3d 843, 860 [271 Cal.Rptr. 893].) In the area of child custody, judges "order evaluations to obtain a neutral mental health professional's assessment of the family, each parent's capacity to parent, and the children's needs and capabilities." (Cal. Child Custody Litigation and Practice (Cont.Ed.Bar 2012) § 9.1, p. 311 (rev. 1/12).)

Because "the results of an independent evaluation generally are given great weight by the judge in deciding contested custody . . . issues, the Judicial Council has adopted rules of court establishing uniform standards of practice for court-ordered custody evaluations." (Hogoboom and King, Cal. Practice Guide: Family Law (The Rutter Group 2012) ¶ 7:243, pp. 7-83 to 7-84 (rev. # 1, 2012).) California Rules of Court, rule 5.220 governs child custody evaluators appointed under section 730 and requires them to "[m]aintain objectivity, provide and gather balanced information for both parties, and control for bias." (Cal. Rules of Court, rule 5.220(h)(1).) Additionally, a court-appointed evaluator in a child custody proceeding under the Family Code is prohibited from engaging in ex parte communication with a party's counsel or with the court, except in limited circumstances. (Cal. Rules of Court, rule 5.235(c).) Superior Court of Orange County, Local Rules, rule 703.C.2.a, generally prohibits ex parte communications by counsel with a mediator, so as to protect the mediator from unilateral influence and to preserve his or her neutrality. (*In re Marriage of Seagondollar* (2006) 139 Cal.App.4th 1116, 1133 [43 Cal.Rptr.3d 575] [concerning former Super. Ct. Orange County, Local Rules, rule 716(F) regarding evaluators]; see Fam. Code, § 216, subds. (a) & (b).) In *Seagondollar*, this court stated: "The rules of procedure for reaching family law decisions—contained in the Family Code, the Code of Civil Procedure, the California Rules of Court, and local court rules—are not mere suggestions. The rules of procedure are commands which ensure fairness by their enforcement." (*Seagondollar*, at p. 1120.)

Thus, impartial objectivity is a critical requirement for a section 730 child custody evaluator. The following passage from a recent opinion, although discussing special masters rather than evaluators, is instructive: " 'Special masters are generally used in high-conflict family law cases. One or more of the parties is likely to be combative, adversarial and difficult to deal with. The special master must remain neutral and impartial. The special master must avoid the appearance of favoring one side or the other or [aligning] himself with one side or the other.' " (*Rand v. Board of Psychology* (2012) 206 Cal.App.4th 565, 569 [142 Cal.Rptr.3d 288].) In *Rand*, "the focus of the case had shifted from resolving conflicts between the parents to resolving conflicts between" the mother and the special master. (*Id.* at p. 570.) The Board of Psychology "found that it is necessary for a special master to be impartial and to preserve the appearance of impartiality . . . ." (*Id.* at p. 571.)

With these precepts in mind, we must first evaluate whether the court properly denied father's motion to remove the evaluator before we can consider whether the court appropriately awarded mother sole legal custody. In reviewing the court's ruling on father's removal motion, our threshold inquiry is whether Jimenez exhibited bias against father (in violation of Cal. Rules of Court, rule 5.220(h)(1)) prior to father's filing of the removal motion. The facts (set forth in father's removal motion) are essentially

undisputed. Although mother sought to explain and justify Jimenez's actions, she did not dispute they occurred. Thus, whether Jimenez was biased against father is a question of law we may review de novo. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960].) We need not do so, however, because the court made a factual finding that Jimenez lost his objectivity, a finding clearly supported by substantial evidence. When Jimenez ordered father to prepare forthwith a safety plan covering his entire house, garage and yard and to change his "perspective," the psychologist showed he had developed a negative prejudgment of father with no adequate rational basis, such that he presumed father's custody of J. endangered the boy. Jimenez established a pattern of acting upon mother's complaints against father, resulting in the evaluator making escalating demands on father accompanied by unreasonable deadlines and threats. The trial court properly found Jimenez acted with bias against father.

Yet, despite that finding, the court denied father's motion to remove the evaluator. The court concluded the psychologist's behavior was not sufficiently "egregious" to justify the "draconian" step of removing him as evaluator. Jimenez's misconduct had two aspects: (1) he exceeded the scope of the section 730 evaluation, and (2) he exhibited bias against father. Thus, the court impliedly found that neither Jimenez's overstepping of his section 730 role, nor the *degree of bias* he exhibited, nor even the combined effect of both, was egregious enough to warrant his removal. We will focus on the bias aspect of Jimenez's misconduct because, as we shall explain later in this opinion, the court's award of sole legal custody to mother cannot stand if the ruling was tainted by the influence of Jimenez's bias against father.

It is unclear what standard of review applies to a court's ruling on a motion for removal of the evaluator. Although it is well established that an appellate court reviews for an abuse of discretion a trial court's custody orders (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 [51 Cal.Rptr.2d 444, 913 P.2d 473]) and its rulings on whether to *appoint* a section 730 evaluator (*In re Daniel C. H.* (1990) 220 Cal.App.3d 814, 835 [269 Cal.Rptr. 624]), it appears to be an open question what standard of review applies to a court's ruling on a parent's motion for *removal* of a child custody evaluator who has exhibited bias against that parent in violation of California Rules of Court, rule 5.220(h)(1).

But, even if we apply the most deferential standard of review, we conclude, under the totality of the circumstances here, that the court abused its discretion by denying father's application to stay the evaluation and remove Jimenez as the evaluator. We summarize those circumstances chronologically. First, father stated in his motion a prima facie case that Jimenez was biased. Mother did not dispute the alleged underlying facts. Nonetheless,

.the court refused to stay the section 730 evaluation pending the hearing scheduled for three weeks later. Then, on the day of the hearing, the court refused to allow father's expert witness to take the stand. Furthermore, even though the court had received Jimenez's report, the judge did not read the document at that time to consider whether the report was biased. Ultimately, the court denied father's removal motion because (1) so much time, effort, and expense had now been spent on the finished report, and (2) Jimenez's lack of objectivity and his overstepping his role as an evaluator were insufficiently egregious to warrant the "draconian" result of wasting the time and expense already expended. With this ruling, the court raised the bar on the degree of bias necessary to justify removal of the evaluator now that Jimenez's report was complete. This reasoning is problematic. As father's counsel pointed out, the court's earlier refusal to stay the section 730 evaluation gave Jimenez the time to start writing his report and to conduct the bulk of his work. More importantly, bias cannot be assessed on a sliding scale relative to the amount of work already expended on the evaluation. Indeed, a finished report, if biased, is highly prejudicial to the injured party.

In *In re Marriage of Laurenti* (2007) 154 Cal.App.4th 395, 400–401 [64 Cal.Rptr.3d 449] (*Laurenti*), the trial court removed a section 730 evaluator for making one ex parte communication to a party's counsel. Here, Jimenez made ex parte communications to mother's counsel and the court, and imposed an escalating series of accusatory demands on father. Most or all of these demands were made at mother's request. Father, quite reasonably, finally concluded he could no longer talk openly with Jimenez for fear Jimenez would try to present him in a negative light. Father then moved for Jimenez's removal and his counsel asked Jimenez to recuse himself. Jimenez refused to recuse himself, forbade father and his counsel from contacting him, and proceeded to write a biased report (described below). Under these circumstances, the court abused its discretion by denying father's motion for the removal of Jimenez as the evaluator.[9]

But we must still consider whether the court abused its discretion by awarding mother sole legal custody of J. In doing so, we bear in mind that child custody evaluations carry great weight and entail potentially grave consequences to the parents, as well as to the best interests of their children. The mandate that an evaluator be fair and impartial is nonnegotiable. Where

---

[9] Our conclusion here is limited to the unique facts before us. Our intent is *not* to specify onerous procedures which must be followed whenever a party moves for the removal of an evaluator for bias. The efficacy of section 730 child custody evaluations, as well as the willingness of licensed professionals to act as evaluators, would be impeded if a party, upon sensing he or she is likely to lose or due to a distaste for the evaluator, could hinder the process merely by filing an application for the evaluator's removal. Furthermore, the filing by one parent of such a motion may well create some animosity between the evaluator and that parent, but such conflict alone does not necessarily constitute bias on the part of the evaluator.

the facts reveal that an evaluator may be biased against one party, the court must make every effort to examine the issue and allow a fair inquiry into it.

Here, the court saw no need for an evidentiary hearing on father's removal motion. It ultimately denied his removal motion and laid the onus on father to discredit, if necessary, the report.[10] Subsequently, at the custody hearing, when father's counsel argued the report should not be considered due to Jimenez's bias, the court expressed frustration about the "waste of time" and stated "we have already litigated this" and "your concerns with Dr. Jimenez's report go to the weight." Father's counsel then cross-examined Jimenez, eliciting his admissions he is *not* an expert in autism or Asperger's syndrome and he never questioned psychiatrist Singh about each parent's compliance with J.'s medication protocol. When father's counsel asked Jimenez whether mother gave him any ex parte documents during the evaluation period, the court terminated counsel's cross-examination of Jimenez on section 352 grounds, stating, "To the extent that this line of questioning has any probative value whatsoever, which, frankly, appears to be very minimal, it is substantially outweighed by the undue consumption of time." Subsequently, the court expressly relied on Jimenez's report in awarding mother sole legal custody and stated for the record that it found the report to be "detailed and useful."

Jimenez's report, however, casts father in such an unfavorable light that we cannot discount the possibility that the evaluator's preexisting bias against father tainted the report's contents.[11] At the custody hearing, the court stated, "There is a lot in Dr. Jimenez' report that would suggest that perhaps joint legal custody is not appropriate here." *Nominally*, the report recommends that the parties share joint legal custody of J., but Jimenez then goes on to say that mother should have authority over J.'s "middle school education, medical care (including dietary restrictions), psychiatric and psychological treatment, and [CARD]"—in other words, every significant aspect of parental decision-making.[12] Inconsistently, the report states the parents have successfully cooperated on J's schoolwork and medications, leaving one to wonder why Jimenez felt mother should have sole authority over those areas.[13] The report omits the psychological test results described in father's declaration, which

---

[10] Compared to challenging an unbiased report on the basis of methodology and conclusions and the like, the task of exposing bias in an evaluation is complicated by the possibility that bias may be subtle, hidden, and artfully disguised.

[11] We divulge only such limited information from the confidential report as is critical to the issue on appeal.

[12] Perhaps based on the nominal recommendation, mother's counsel characterized the recommendations as "very fair minded" and unlikely to be "upsetting" to father.

[13] The evidence shows father has been supportive of and involved in J's education at Thurston. At the custody hearing, psychiatrist Singh testified father was compliant with J.'s medication program and she saw no reason why father should not be involved in decisionmaking regarding J's medical treatment or educational issues.

indicated that father has no psychological disorder or a minimal one, while mother exhibits psychological dysfunction of mild to moderate severity. Instead, the report's psychological sections portray mother more favorably than father; we do not divulge the details. The report states father has no homicidal or suicidal ideation, yet contains a few passages upon which mother apparently based her unfounded declaration that father has homicidal and suicidal tendencies. Jimenez listed eight of mother's concerns about father and concluded six of mother's concerns had merit, one might have merit, and one might have had merit in the past. In contrast, Jimenez listed five of father's concerns about mother and concluded four of them were without merit and only one of them had merit. In the report, contrary to the court's ultimate assessment of J.'s knife as a "small folding pocket knife," Jimenez described the knife as "a large knife with a black handle that was six and one-half inches long, containing a two and one-half inch serrated steel blade." Jimenez stated it could *not* be characterized as a pocket knife.[14] Toward the end of the report, Jimenez warned that in any future appointment of an expert in this case, the court should include language in its orders protecting "the expert from frivolous complaints from California professional licensing boards such as . . . The Board of Psychology . . . ." This is an obvious allusion to father's lodging a complaint against Jimenez with the State of California's Board of Psychology.[15]

Unfortunately, Jimenez's bias may have tainted J.'s opinion of father. The evaluator's views probably carried great weight in the 13-year-old's mind. Jimenez accused father of criminally endangering J. by planning a boat trip and by allowing J. to carry a pocket knife. By doing so, Jimenez may have unilaterally put an end to the two activities father had previously shared with his son. Also, the accusations may have reinforced, in J.'s mind, his mother's claims he was unsafe with father. Furthermore, there was evidence mother told J. of statements from Jimenez's report that caused J. to grow fearful of father. Exacerbating the situation, due to Jimenez's breach of confidentiality of J.'s psychiatric records, J. was prevented from seeing his psychiatrist at this time. It was during this time period that J. was interviewed by the court and expressed his preference to see father only on holidays and when mother was on vacation.

■ Because the court awarded mother sole legal custody based at least in part on Jimenez's biased report and on J.'s statements which may have been influenced by Jimenez's bias, the order must be reversed.

[14] At trial the knife was introduced into evidence. Its box is about four and a half inches long and prominently states "Pocket Knife."

[15] We hereby deny father's motion for judicial notice of a June 18, 2012 accusation filed by the Board of Psychology against Jimenez. This information was not before the court.

*The Court Erred by Denying Father's Request for Appointment of a Special Master*

The parties agreed in the judgment to submit disputes concerning their son to a special master. Use of a special master can facilitate, and make possible, joint custody between parents with strongly contrasting viewpoints, who might otherwise arrive at an intractable impasse. For example, in this case, the choice between Ensign and Thurston as a middle school for J. was unlikely to be resolved absent (1) capitulation by one parent to the other, or (2) the intervention of a neutral third party or the court. Here, the court's award of sole legal custody to mother might have eliminated future stalemates but at the price of depriving J. of a countervailing viewpoint to mother's beliefs on all important aspects of J.'s life and upbringing. The record suggests that each parent's deeply held views are well intentioned and credible, and furthermore, that neither parent is clearly right or wrong.

"Long-term incremental decision-making models have many advantages. Small issues get resolved before they blow up into large ones. The parenting plan can be fine-tuned based on ever-changing circumstances and experiences. A neutral professional working with a family gets to know the family members well over time." (Cal. Child Custody Litigation and Practice, *supra*, § 4.44, p. 134 (rev. 1/11).) Indeed, "[b]ecause of the expense and potentially polarizing effect of a custody . . . evaluation, it is rarely desirable to start with this step before attempting to resolve a parental disagreement through some combination of education, counseling, negotiation, and mediation." (*Id.*, § 8.8, p. 267 (rev. 1/12); see Fam. Code § 3170, subd. (a) [when pleading seeks to modify a custody order, the court must "set the contested issues for mediation"].)

On remand, the parties' stipulated divorce judgment should be enforced and a successor special master selected in accordance with its provisions.

*The Court Erred by Failing to Determine Reasonable Evaluator's Fees*

██ Finally, father contends the court erred by failing to set a reasonable fee for the section 730 evaluation. In *Laurenti, supra*, 154 Cal.App.4th at page 403, the Court of Appeal stated: "When read together, we interpret Evidence Code section 730 and California Rules of Court, rule 5.220 to mean a trial court must (1) decide whether an evaluator should receive any compensation for his or her services, (2) determine a reasonable amount of compensation and (3) state which party or parties will bear what portion of the fees and costs." (*Ibid.*) "California Rules of Court, rule 5.220(d)(1)(D) . . . requires the trial court to '[d]etermine . . . any fees or costs of the evaluation.' " (*Ibid.*) "In order to determine reasonable compensation, the court must at least

review the evaluator's bill and give some consideration to the value of the services provided." (*Id.* at pp. 403–404.) "Because the trial court did not determine a reasonable fee for [the evaluator's] services," the appellate court reversed the order requiring the appellant to pay the evaluator's fees and costs and remanded the matter to the trial court for a new hearing. (*Id.* at p. 404.) The Court of Appeal instructed the trial court to consider whether the evaluator was "entitled to any compensation at all due to his violation of court rules." (*Ibid.*) The Court of Appeal stated the parties should be allowed "to brief all of these issues and submit evidence in advance of the new hearing." (*Ibid.*)

In father's removal motion, father asked the court to "vacate the current order for payment to Dr. Jimenez and set the reasonable fees for Dr. Jimenez, if any." At the hearing on father's removal motion, the court found Jimenez acted "outside the scope of a [section] 730 evaluation." The court stated, "I would not be inclined to order a fee paid for conduct that seems clearly to be outside the scope of a [section] 730 evaluation." The court observed that a fee of almost $42,000 "is exceptionally high." Finally, the court reserved the issue and said it would "take a look at that" at the custody hearing.

At the custody hearing, Dr. Jeffrey Arden, a psychologist who conducts section 730 child custody evaluations, testified he had a phone conversation with Jimenez around six months earlier. Jimenez said he was excited about being recently admitted to the Orange County child custody panel and that he had "caught his first case and it had, quote, 'deep pockets,' and that he was assigned simultaneously as child custody evaluator and special master . . . ." Arden was surprised because those "are conflicting dual roles," and psychologists are required "to inform the court [of this] if the court does appoint us in simultaneous roles."

In her closing argument at the custody hearing, father's counsel advised the court that Jimenez had been paid over $15,000 for his school recommendation report. She asked the court to "allow counsel to submit pleadings" on whether Jimenez should be paid any further fees.

The court rejected father's request, stating the parties had had an opportunity to make a full record and present any evidence they felt was appropriate. Because the parties had "failed to make a record on which the court could make a rational and reasoned determination that it would be appropriate to reduce Dr. Jimenez's outstanding bill," the court ordered each party to pay half of the bill.

We agree with *Laurenti*, *supra*, 154 Cal.App.4th 395 that the court had a duty to review Jimenez's billing statements and determine a fair compensation after an evidentiary hearing. The court erred by failing to fulfill its duty.

## DISPOSITION

We reverse the March 7, 2011 order denying father's removal motion and the June 9, 2011 legal custody modification order (including the order for each party to pay half of Jimenez's fees). On remand, the court shall enforce the special master provisions of the parties' stipulated divorce judgment and hold an evidentiary hearing to determine a reasonable compensation for Jimenez's services, if any, and the proper allocation of those fees and costs among the parties. Father shall recover his costs incurred in this appeal.

Moore, Acting P. J., and Thompson, J., concurred.