Filed 12/19/14; unmodified opn. attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| LESLIE O., | No. B257385 |
| Petitioner, | (Super. Ct. No. PD054501) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | ORDER MODIFYING OPINION |
| Respondent; | [NO CHANGE IN JUDGMENT] |
| THOMAS O., | |
| Real Party in Interest. | |

THE COURT:

It is ordered that the opinion filed herein on November 25, 2014, and reported in the Official Reports (___ Cal.App.4th ___) be modified in the following particulars:

1. On page 2, first sentence under the subheading "A. Facts," the words "Ann M. Convertino, LCSW (Convertino)" are changed to "an LCSW (the Evaluator)" so the sentence reads:

In September 2012, an LCSW (the Evaluator) was appointed as the child custody evaluator in this case.

2. Thereafter, throughout the opinion, "Ann M. Convertino," "Convertino," "Ann," and "Ann C.," are replaced with "the Evaluator."

There is no change in the judgment.

ROTHSCHILD, P. J.                    MILLER, J.*

_____

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 11/25/14; unmodified version

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| LESLIE O., | No. B257385 |
| Petitioner, | (Super. Ct. No. PD054501) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | OPINION AND ORDER GRANTING PEREMPTORY WRIT OF MANDATE |
| Respondent; | |
| THOMAS O., | |
| Real Party in Interest. | |

ORIGINAL PROCEEDING; petition for a writ of mandate.  C. Virginia Keeny, Judge.  Petition granted.

Lipton & Margolin, Hugh A. Lipton and Brian Gregory Magruder for Petitioner.

No appearance for Respondent.

Law Offices of Fletcher, White & Adair, Paul S. White; Law Offices of Dacorsi, Placencio & Rumsey and Denise Susan Placencio for Real Party in Interest.

_____

Petitioner in a marital dissolution case moved to have the child custody evaluator removed for bias and her evaluations stricken. The trial court denied the motion. We conclude the court erred in finding insufficient evidence of bias and denying the motion. We grant the petition and issue a peremptory writ of mandate.[1]

## BACKGROUND

This is a marital dissolution case involving hotly contested issues of child custody. Petitioner Leslie O. and real party in interest Thomas O. have one minor child, Wyatt, who was born in 2009 with a condition causing him to have developmental delays and special needs. We set forth the record available to us with the utmost particularity, as the well-being of an unrepresented minor is at stake.[2]

We conclude that, considering the totality of the circumstances, the child custody evaluator's communications and her conduct in stepping out of her role as an evaluator to help Thomas demonstrate bias sufficient to warrant her removal and the striking of her evaluations.

### A. Facts

In September 2012, Ann M. Convertino, LCSW (Convertino), was appointed as the child custody evaluator in this case. Convertino had each parent identify persons with relevant information. Leslie listed Margaret Burr under the heading "Parent's Psychotherapists (current & past)." The form noted Burr had served as a joint counselor

---

[1] As there is not a plain, speedy and adequate remedy at law, and in view of the fact that the issuance of an alternative writ would add nothing to the presentation already made, we deem this to be a proper case for the issuance of a peremptory writ of mandate "in the first instance." (Code Civ. Proc., § 1088; *Brown, Winfield & Canzoneri, Inc. v. Superior Court* (2010) 47 Cal.4th 1233, 1237–1238; *Lewis v. Superior Court* (1999) 19 Cal.4th 1232, 1240–1241; *Alexander v. Superior Court* (1993) 5 Cal.4th 1218, 1222–1223; *Ng v. Superior Court* (1992) 4 Cal.4th 29, 35.) We requested and received opposition and notified the parties of the court's intention to issue a peremptory writ. (*Palma v. U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 180.)

[2] In an effort to protect the parties and the child, however, we have sought to disclose only the information necessary to our analysis. We include no specific quotations from the confidential evaluations themselves.

2

to Leslie and Thomas for four sessions in 2009, and subsequently had become Leslie's "Individual Counselor," seen in 2011 and "recently since divorce proceedings." The form also listed Stacie A. Gereb, D.O., as Wyatt's "Primary Pediatrician."

Convertino interviewed Leslie and Thomas individually.[3] She also interviewed many other persons. Thomas contended Leslie suffered from a severe mental illness. At one time he characterized it as "Borderline Personality Disorder." Leslie feared Thomas had persuaded Convertino that Leslie suffered from a severe mental illness and asked her therapist, Burr, to contact Convertino to disabuse her of any such notion. Burr e-mailed Convertino on November 5, 2012, stating in pertinent part: "I observed—in my [joint counseling] sessions with them—that Tom labeled Leslie's controlling nature as 'mental illness,' saying she was bipolar. Leslie has told me that Tom's mother's therapist (who Leslie has never met) 'diagnosed' her as having a personality disorder. [¶] Although I believe these labels are simply part of the negative, angry fighting this estranged couple does . . . Leslie is concerned that you may be under the assumption that she has a major mental illness diagnosis. [¶] She does not."

Convertino responded by e-mail, reassuring Burr that Convertino was not "assigning any weight to claims of mental illness for Mrs. O[.] that have not been appropriately diagnosed by a professional in a manner consistent with best practices." Convertino then indicated she wanted to know how the couple behaved during joint counseling sessions. In particular, she asked about Tom calling Leslie "'the C word'" and saying things like "'fuck you bitch'" and other extreme verbal abuse. She also asked about "'one incident of Leslie striking Tom'" during a joint counseling session.

Burr responded that Tom had been extremely verbally abusive, using a loud voice, and was so agitated and aggressive that she wondered about his impulse control and became concerned about imminent violence and the potential need to call a security guard. She reported Leslie was "more passive overall," while Thomas "seemed to have

---

[3] She was authorized to have ex parte communications with the parents by California Rules of Court, rules 5.220(e)(2)(B) and 5.235(a).

3

no restraint and bullied her . . . . [¶] After one session I wrote: 'Incident on Saturday . . . he called her 'cunt' she walked away. There was a yelling match. Leslie says 'it got physical—he pushed me and I hit him back.' I ask her how, she holds both hands palms out, in a shoving motion. . . . [¶] This is the only time I can recall when anything physical happened while I was working with them, although I inquired each time we met, because of that one time." Convertino responded by asking Burr if there was any substantiation that Thomas had called Leslie a "cunt." Burr was unable to recall. Although her records revealed that Burr was Leslie's current individual therapist, the record before us indicates Convertino did not make any other significant requests to Burr for information about Leslie's mental health.

On or about November 4, 2012, Wyatt suffered a broken arm and other injuries in a bicycle accident while he was in the care of Thomas. This necessitated a trip to his pediatrician, Dr. Gereb, care by Dr. M. Howell, and serious surgery. Leslie contended Thomas was negligent in failing to protect three-year-old Wyatt from injury, as he had had three bicycle accidents in the four-month period from August through November 2012 while in Thomas's care. On at least one occasion, Wyatt had sustained a bump on his head in a position that demonstrated to Dr. Gereb that he could not have been wearing a helmet while riding the bicycle.[4]

Apparently in connection with Leslie's contentions that Thomas was negligent in failing to protect Wyatt, Convertino interviewed a neighbor who said Thomas was an extremely loving father, he was attentive to Wyatt's safety when Wyatt was on the bicycle, and Wyatt always wore a helmet while on the bicycle. The same neighbor reported that Leslie was unfriendly and controlling and that the neighbor had "'heard things'" about her. The remarks are referred to in the record as having been included in Convertino's evaluation.

---

[4] It might have been these injuries that caused a social worker concern as to Munchausen's syndrome by proxy (see fn. 5, *post*), although it is unclear how the genesis of the injuries could have been attributed to Leslie since the bicycle accidents had occurred when Wyatt was with Thomas.

Thomas and Convertino had communications that suggested to Leslie that Convertino was "advising Thomas on specific matters." On November 7, 2012, Thomas e-mailed Leslie about arrangements for a visit the next day with Wyatt. He concluded by writing: "As far as answering the rest of your questions. I need to talk to Ann [Convertino] first. After I talk to her, I will reply to your questions." On that day, Leslie e-mailed Convertino: "I am not sure I understand Tom's response correctly that he must first speak with you before responding. I apologize for my lack of understanding, but wondering if you are advising Tom on specific matters?" Leslie added that Thomas's statement regarding Wyatt's bicycle crash on November 4 "has many lies, fabrications and deceptions regarding the truth." On November 8, Convertino responded by e-mail to Leslie. "I am not advising Tom on anything as that would be beyond the scope of my role as Evaluator. However, he sent his 27 hour summary of events to me on Monday, and mentioned that his attorney had asked him to write it. I wanted him to send a copy to you, but needed to be sure this was o.k. with his attorney, as he asked him to write it and may have had a purpose I was unaware of. I did so, and then asked Tom to send it to you after his attorney said it was ok. [¶] . . . Ann M. Convertino, LCSW."

On November 19, 2012, Convertino submitted her initial evaluation to the trial court. Neither party has supplied a copy of the evaluation to this court. From the record, we gather the evaluation made 78 references to Leslie's "mental status, problems and issues." It also stated a social worker (possibly investigating Wyatt's bicycle accident injury) "expressed some concern about her [Leslie's] mental health, and noted that in her view the amount of medical information that [Leslie, who is a nurse,] conveyed, with regard to the minor, and the way she conveyed it produced a 'red flag' for her regarding possible 'Munchausen's by Proxy Syndrome' (see definition in Evaluation Section of this report).[5] She states that she is unclear whether or not [Leslie] has ever had any real

---

[5] "Munchausen's syndrome by proxy [is] a condition whereby a parent secretly causes the child's illness in order to attract attention or sympathy . . . ." (*Ramona v. Superior Court* (1997) 57 Cal.App.4th 107, 120.) This attention or sympathy is referred

mental health assessment, and that a Public Health Nurse who accompanied her to the home visit at [Leslie's] house also had 'the same impression' regarding [Leslie], and the need for possible further inquiry regarding her mental health.  [The social worker] states that overall, and at this time, she is not concerned about the child's physical safety with either parent."

Leslie showed the confidential evaluation to Burr immediately.  Burr e-mailed Convertino on November 20, 2012, asking that Convertino make a few changes in her report.  Burr wrote, "I currently see Leslie for individual therapy and I have never considered her to have any major mental health condition since she shows unimpaired functioning in her life in all areas other than this one.  [¶]  . . . Is it possible to remove the implications of severe mental illness?  [¶]  Also, there is a slight correction I request in the details relating to the physical violence."  She went on to say that it was a mischaracterization for the evaluation to say Leslie "hit" Thomas when she was merely pushing him away from her when Thomas was behaving in a threatening manner, pushing Leslie.  Burr requested that Convertino change that part of the evaluation as well.

Convertino responded to Burr, representing that she did not realize Burr was Leslie's current therapist, "or I would have taken more care in quoting you directly."  She denied she had "actually endorsed the idea that Mother [Mrs. O.] has a severe mental illness.  It was the DCFS worker who raised the issue of Munchausen's and because she did, I had to include it in my report as something she brought up.  However, in my final analysis, I reserved judgment on the issue, noting that it could be temperament, training, or the wish to do things differently in this custody situation then [*sic*] she had in the last one with her adult sons.  Any of these possibilities is plausible to me, but in my mind, the proof will be in how Mrs. O[.] responds to the reality that she cannot continue in the manner that she has been with regard to her attitude and behaiors [*sic*] toward Mr. O[.] because there is no objective support for her positions."  Convertino acknowledged

to as a "'secondary gain'" benefiting the offending parent. (*Williamson v. State of Texas* (2010) 356 S.W.3d 1, 11.)

Thomas had anger issues and that she believed she had made the appropriate recommendations to address these in her evaluation. She added, "I cannot change anything that has already been written as it has been submitted to the attorneys. I will be submitting an addendum, with regard to the parenting plan, related to something I misunderstood from Mr. O[.]'s perspective that must be addressed. But that is a change in the final points of the plan, not in the substance of how I reached the conclusion that the plan should be as I outlined." In closing, Convertino asked, "I am wondering if Mrs. O[.] shared the report with you."

On November 23, 2012, Burr e-mailed Leslie's attorneys, stating: "I am quoted in the . . . custody evaluation in such a selective way that the intent of my reporting is skewed. I have asked Ann Convertino to change the wording she used because it lacks the context in which it was used, but she said the change cannot be made as the document has 'gone to the attorneys.' After telling me this, she explained that she was, however, making an addition to the report concerning the custody scheduling. I guess some things can be changed and some cannot. . . . [¶] Specifically, she quotes me as saying, 'shoving, pushing and at least one incidence of Leslie striking Tom,' and repeats this quote several times." Burr expressed concern that the statement was incorrect, taken out of context, and "it sounds as though 'Leslie striking Tom' was something . . . which happened repeatedly." Burr also observed Convertino had told her that she had to report the social worker's comment about Munchausen's syndrome by proxy simply because it was "brought up." Burr pointed out that she had brought up something critical of Thomas to Convertino, but Convertino had failed to include that in her evaluation. She added that the social worker was unqualified to make such a diagnosis of Leslie. Finally, Burr expressed her opinion that Convertino was biased against Leslie.

There were other complaints from medical professionals about incorrect, out of context statements and potential bias in Convertino's evaluation. Wyatt's lifelong pediatrician, Stacie Gereb, wrote to Convertino on November 27, 2012, expressing concern that, although she was told to expect a call from Convertino, the evaluator had never contacted her. Gereb was extremely critical of Thomas's inattention to Wyatt's

7

physical safety, explaining Wyatt had had three bicycle accidents during the four-month period of August through November 2012, all while in Thomas's care. Apparently in contrast to something in Convertino's evaluation, Gereb said Wyatt could not have been wearing a helmet during the second accident due to the location of a bump on his head. Gereb opined that three-year-old Wyatt, who suffered from muscle weakness and clumsiness, should not even have been riding a bicycle. Gereb complained that Convertino's evaluation misquoted Gereb's physician's note, which had stated that Wyatt was not wearing a helmet during the second accident. The note also explained that Wyatt had broken his arm and had blood in his stool as a result of the third accident, which occurred November 4, 2012.

On November 27, 2012, Dr. M. Howell e-mailed Convertino, contending Convertino had taken Howell's comments to her out of context. It appears from the e-mail that Convertino had concluded in her evaluation, based on something Howell had told her, that Wyatt was being injured more frequently than would be expected, Leslie was taking him to the doctor more frequently than would be expected, and Leslie might suffer from Munchausen's syndrome by proxy. Howell protested that these allegations were unfounded and explained why, concluding: "If there is a pattern in the child's atypical or high velocity injuries, that links neglectful behavior, to a specific caregiver, I hope you are able to discover the cause, but it is not my opinion that Ms. O[.] is expecting secondary gain[6] from her child's recurrent injuries."

Around this time, Convertino sent the court a "revised" evaluation which is not part of the record. Apparently, it clarified that the social worker who said she suspected Leslie suffered from Munchausen's syndrome by proxy was from the Los Angeles County Department of Social Services. The record does not suggest Convertino added anything in the revised report reflecting the additional information and corrections received from Burr, Gereb, and Howell.

---

[6] This is medical terminology for the benefit derived by a parent who suffers from Munchausen's syndrome by proxy.

On November 28, 2012, Convertino sent the following e-mail to Leslie's then-attorney, William Robinson, and Thomas's then-attorney, Rand Pinsky: "Dear Counsel, [¶] As you know from my previous correspondence, I have received two complaints from collateral sources of information [Burr and Howell] who have been given copies of the Child Custody Evaluation report by Mrs. O[.] and have emailed me to argue and/or ask for changes in what they originally conveyed to me. I have now received a long email from Wyatt's pediatrician [Gareb], whom I did not speak with, because I was able to obtain an overview of all the medical information from Kaiser through one of the staff Social Workers which was adequate to my inquiry. [¶] The pediatrician is also complaining of being misquoted, although what I wrote came from the hospital Social Worker. I am unsure what, if anything, can be done to persuade Mrs. O[.] to refrain from sharing the contents of what is supposed to be a confidential report with whomever she chooses. However, I believe that her actions should be noted and possibly brought to the attention of the Court as well."

On November 30, Pinsky responded, "I agree with your comments about informing the court of her conduct."

The same day, Convertino responded to Pinsky without copying Robinson: "I already have. I sent the Court the 'revised' version of the report and copies of the two letters I sent to you and Mr. Robertson [*sic*] as the quickest explanation of all the issues that have transpired since I actually finished and emailed the report to you. However, that letter only references her showing the report to two people when it's actually been 3 that I know of."

On December 7, 2012, Convertino signed an "Addendum" to her evaluation. The sole topic was that Convertino had misunderstood Thomas's work schedule, the visitation schedule she had proposed would be inconvenient to his work schedule, he had objected to her proposed visitation schedule, and an alternative schedule could be substituted for the original one. The Addendum did not mention any of the points raised by Burr, Gereb, or Howell.

On December 19, 2012, the trial court held a hearing following its review of Convertino's evaluation and ordered that Convertino prepare a supplemental evaluation to cover the next three months.

On February 16, 2013, Thomas e-mailed Convertino. "Hello Ann, [¶] I had a meeting with my lawyer at the end of January to make the schedule for visitation for February and March. Leslie is totally out of control . . . ." He went on to lament the grief the custody battle was causing him and his family. He also expressed confusion as to where he could obtain information about his case. He told her his lawyer was not returning his calls and had implied he should keep in touch with Convertino regarding developments in the case, but he also acknowledged she had previously advised the parties they should cease communications with her because her evaluation was complete. He asked her whether he should continue to contact her.

Convertino responded the same day as follows: "I am genuinely sorry to hear of all the continued difficulties with your case. Let me tell you what I know. After receiving emails from both you and Leslie in early January, that a Supplemental Evaluation had been ordered, I emailed both attorneys with regard to this and asked what the return date for the report would be. On January 17th, your attorney sent me a copy of the Court transcript for the 12/19/12 hearing. A few days later, I heard from Leslie's attorney and then I emailed both that my fee for a Supplemental Evaluation was $3500.00 and that to make a 3/26/13 return date (as indicated in the transcript) I would need to begin soon. [¶] I have not heard from either attorney since. At this point, the attorneys would usually drive the process by determining how payment is to be made and getting back to me about a start date, but since I have not heard from either of them, time has gone by, and we will likely need a short continuance for me to have adequate time to produce a report. [¶] Please let me know if you plan to continue with your current attorney or seek new counsel, so that I know who to contact about the need for a continuance. As you know, I would also need a retainer of $1750 to begin, with the balance due prior to the completion of the report. [¶] Finally, the reason I told you and Leslie not to continue copying me on your correspondence, after I completed the first

10

evaluation, is because Evaluators cannot continue working on a case without further orders from the Court. I was not aware that further orders were actually made until sometime in January, and it seems both attorneys have gone silent on the issue of ensuring that payment arrangements are made and the case is moving forward. [¶] Please let me know how you would like to proceed. [¶] Best regards, [¶] Ann M. Convertino, LCSW."

On February 17, 2013, Thomas e-mailed back, saying his lawyer had "quit replying to my pleas for help" and had failed to remedy a mistake as to visitation times "that has caused me so much heart ache ever since the" custody hearing. He reported, "The problems with Leslie are spiraling out of control and my lack of help from anyone is causing myself and my whole family a tremendous amount of grief." He complained about specific instances of Leslie's conduct in November and December and reported that his lawyer had been unprepared and unfamiliar with the facts at the December 19 hearing. He stated, "I really thought the diagnosis from the Child and Family Services of Leslie having Munchausen By Proxy would have added some weight to the fact that Leslie has some serious problems that need to be addressed and I had hope she would have at least been ordered to get some help as you recommended. [¶] I confronted Wendy, the representative from Child Services and asked her if they were going to pursue their diagnosis of Leslie. She finally admitted that it was too hard to prove and that she had only recontacted me to wrap things up and close the case. She responded as everyone responds!"

That same night, Convertino e-mailed Thomas back as follows: "Mr. O[.], [¶] [Were] you given a copy of my report to read? Your attorney was emailed a copy well in advance of the Court date which makes your description of what has happened prior to your hearing incomprehensible to me. From your description of what has happened, it would appear that you need a new attorney. I did my job, and worked very hard to provide a comprehensive and balanced analysis of a very complicated situation with a lot of moving parts. At this point a Supplemental has been ordered by the Court and it either needs to be done, or the Court informed of why it cannot be done and the order vacated.

11

The issue of who pays is simply one of many issues that has seemingly not been pushed or addressed by your attorney and it is beyond the scope of my role as an evaluator to advise you what to do. [¶] I will email both attorneys that the issue of payment has not been resolved and that I will issue a short report to the Court that a Supplemental Report will therefore not be forthcoming. I would truly like to see the right things done in your case but I can only say what I think those things should be. It is up to the attorney to take what I provide and bring that before the court in a compelling way. [¶] Best, Ann M Convertino, LCSW."

On February 17, 2013, Thomas sent an e-mail to Convertino stating: "Ann, I know you did your part and spent a great deal of time on the report. There was a 'Justice' party planned . . . for right after the hearing based on what I read in your report along with all the other events I had pointed out that Leslie had pulled. [¶] My guys from work and my family have been hanging on every step of the build up to the last hearing. The guys said they needed to know there was justice in this world and we were all going to celebrate the outcome of the custody hearing. They all know what Wyatt means to me. [¶] I'm living in a bad dream that I cannot awake from. I appreciate all that you did and all that you could contribute in the future, but I don't have a clue where I stand. Had I not written you I would not even know that this next report even existed. [¶] I don't know what to say. Once again, please let me know what's going on if you hear something."

On February 17, 2013, Convertino responded: "I just want to be clear. There was only one report written by me so far. I actually found out from you and Leslie when you both emailed me in January that a Supplemental had been ordered. Just because I recommend something does not mean a Judge orders it. Normally, I would have been informed of this order by the attorneys but I did not hear from either of them about it. That is unusual. It is also unusual for an attorney to let so much time go by, with the return date for the Supplemental approaching, without driving the process to ensure that payment is made and the process has commenced. [¶] If your attorney is not working for you, perhaps a second opinion is in order. [¶] Ann C."

On May 9, 2013, Thomas sent Convertino another e-mail complaining that Leslie had refused his offer to change the visitation schedule. The same day, Convertino responded, "You made a reasonable offer to solve the problem. I will make more of that too. Please keep me updated if you get a response from her about the change."

On May 24, 2013, Convertino submitted her supplemental evaluation. It is not part of the record.

**B. Procedural history**

On April 14, 2014, after taking the deposition of Convertino and subpoenaing files containing her e-mails with Thomas, Leslie made an ex parte application in the trial court, seeking the removal of Convertino and the striking of her evaluations due to bias. Judge Keeny had replaced a previous judicial officer by this time. She denied ex parte relief but set a hearing for May 9, 2014.

On May 9, 2014, the trial court held a hearing on Leslie's motion to remove Convertino and strike her evaluations. No oral testimony was offered. Leslie's counsel's argument was cut short because Judge Keeny had another pressing matter scheduled to be argued immediately after Leslie's motion. The motion papers did not attach Convertino's evaluations, and Judge Keeny, who was not assigned to the matter when the evaluations were submitted, stated at the hearing that she had not read them. She had, however, received and read the communications and documents described above, all of which were attached to the moving papers as exhibits to Leslie's attorney's declaration in support of the motion. The facts were undisputed. Their legal effect was the issue. Leslie's attorney argued, inter alia, that the e-mails, taken together, established bias requiring the removal of Convertino. Judge Keeny recognized that the case was a "close case" that raised "serious questions about the evaluation," but ultimately determined there was insufficient evidence of bias to warrant disqualification of Convertino or striking her evaluations.

Leslie filed the current petition for a peremptory or alternative writ of mandate, prohibition or other appropriate relief. We granted a stay and requested opposition, which was received, as well as Leslie's reply. Leslie's current petition is founded on two

contentions, both raised previously in the trial court.  The first is that Convertino violated rule 5.220(h)(1) of the California Rules of Court by failing to "[m]aintain objectivity, provide and gather balanced information for both parties, and control for bias" so that Convertino must be removed and her report stricken.  Leslie's second contention is that the November 30, 2013 e-mail from Convertino to Thomas's attorney, which was not copied to Leslie's attorney, was an improper ex parte communication that should have resulted in Convertino's disqualification.

## DISCUSSION

We conclude the trial court erred in failing to remove Convertino for bias against Leslie and to strike Convertino's evaluations, considering the totality of the circumstances.  Consequently, we need not discuss the parties' other contentions.

### A.  Standard of review

The only California case to discuss the issue of the standard of review in assessing a trial court's denial of a motion to remove a child custody evaluator is *In re Marriage of Adams & Jack A.* (2012) 209 Cal.App.4th 1543, 1563–1564.  There the court stated, "[W]e must first evaluate whether the court properly denied father's motion to remove the evaluator before we can consider whether the court appropriately awarded mother sole legal custody.  In reviewing the court's ruling on father's removal motion, our threshold inquiry is whether [the evaluator] exhibited bias against father (in violation of Cal. Rules of Court, rule 5.220(h)(1)) prior to father's filing of the removal motion.  The facts (set forth in father's removal motion) are essentially undisputed.  Although mother sought to explain and justify [the evaluator's] actions, she did not dispute they occurred.  Thus, whether [the evaluator] was biased against father is a question of law we may review de novo."  The *Adams* court went on to note that the applicable standard was "unclear," but that the same result would be achieved if an abuse of discretion test were applied.  (*Adams*, at p. 1546.)  The same is true here.  Whether we review de novo or for abuse of discretion, the evidence required removal of the evaluator for bias.

14

## B. Applicable law

"Over a century ago, our Supreme Court recognized the need for court-appointed 'disinterested . . . experts who shall review the whole situation and then give their opinion with their reasons . . . regardless of the consequences to either litigant. [Citation.] Section 730 [of the Evidence Code] serves this function by authorizing a court to 'appoint a disinterested expert who serves the purpose of providing the court with an impartial report.' [Citation.] 'The job of third parties such as . . . evaluators involves impartiality and neutrality, as does that of a judge . . . .' [Citation.] . . . [¶] Because 'the results of an independent evaluation generally are given great weight by the judge in deciding contested custody . . . issues, the Judicial Council has adopted rules of court establishing uniform standards of practice for court-ordered custody evaluations.' [Citation.]" (*In re Marriage of Adams & Jack A.*, *supra*, 209 Cal.App.4th at pp. 1562–1563.)

Rule 5.220 et seq. of the California Rules of Court establish the rules for child custody investigations and evaluations. "A 'child custody evaluation' is an expert investigation and analysis of the health, safety, welfare, and best interest of children with regard to disputed custody and visitation issues." (Cal. Rules of Court, rule 5.220(c)(3).)

"In performing an evaluation, the child custody evaluator must: [¶] (1) Maintain objectivity, provide and gather balanced information for both parties, and control for bias; [¶] (2) Protect the confidentiality of the parties and children in collateral contacts and not release information about the case to any individual except as authorized by the court or statute; [¶] . . . [¶] (4) Consider the health, safety, welfare, and best interest of the child in all phases of the process . . . ." (Cal. Rules of Court, rule 5.220(h); see Fam. Code, § 3011.)

"All evaluations must include: [¶] . . . [¶] (2) Data collection and analysis that are consistent with the requirements of Family Code section 3118; that allow the evaluator to observe and consider each party in comparable ways and to substantiate (from multiple sources when possible) interpretations and conclusions regarding each child's developmental needs; the quality of attachment to each parent and that parent's social environment; and reactions to the separation, divorce, or parental conflict. This

15

process may include:  [¶]  (A) Reviewing pertinent documents . . . ; [¶]  (B) Observing parent-child interaction . . . ; [¶]  (C) Interviewing parents conjointly, individually, or both . . . to assess:  [¶]  (i) Capacity for setting age-appropriate limits and for understanding and responding to the child's needs; [¶]  (ii) History of involvement in caring for the child; [¶]  (iii) Methods for working toward resolution of the child custody conflict; [¶]  (iv) History of child abuse, domestic violence, substance abuse, and psychiatric illness; and [¶]  (v) Psychological and social functioning; [¶]  (D) Conducting [a wide variety of interviews]; [¶]  (E) Collecting relevant corroborating information or documents as permitted by law; and [¶]  (F) Consulting with other experts to develop information that is beyond the evaluator's scope of practice or area of expertise."  (Cal. Rules of Court, rule 5.220(e)(2)(A)–(F).)

The child custody evaluation is confidential.  (Fam. Code, § 3111, subds. (a), (b).) "If the court determines that an unwarranted disclosure of a written confidential report has been made," the court may impose monetary sanctions "unless the court finds that the disclosing party acted with substantial justification . . . ."  (Fam. Code, § 3111, subd. (d).)

While ex parte communications between the parents and the evaluator are allowed, and indeed necessary, ex parte communications between the evaluator and the parties' attorneys, and between the evaluator and the court, are prohibited, except in specific circumstances not relevant to our analysis.  (Fam. Code, § 216, subd. (a); Cal. Rules of Court, rule 5.235(c)–(f).)

## C.  Considering the totality of the circumstances, Convertino's communications and conduct demonstrated actual bias against Leslie

Convertino's communications are replete with indicia of actual bias against Leslie. In addition, Convertino stepped outside her role as evaluator to advocate against Leslie and help Thomas.  Considering the totality of the circumstances, Convertino's communications and conduct establish her removal was necessary to protect the interest of Wyatt in an unbiased evaluation.

16

**1. *Convertino's e-mails to the attorneys and the communications underlying them***

Leslie contends the November 2012 e-mails from Convertino to the parties' attorneys demonstrate bias against her. To understand the e-mails, one must understand what prompted them. When Leslie saw Convertino's evaluation in November 2012, she quickly showed it to three doctors, apparently because she believed their statements to Convertino or the physician's notes were misquoted, taken out of context, or twisted in favor of Thomas. The three doctors were Leslie's own therapist, the person with the most knowledge of her mental status, Wyatt's lifelong pediatrician, the person with the most knowledge of his history of injuries, and Howell, one of the physicians who treated Wyatt after his bicycle accident. All three doctors confirmed they had been misquoted or misunderstood. Each offered important firsthand information he or she was qualified to provide. These doctors had more information and were more qualified to assist the investigation than the social worker, the public health nurse, and even the neighbor who reported Wyatt always wore his bicycle helmet. Indeed, it is puzzling why Convertino relied in her initial evaluation on such peripheral sources and not on Leslie's own therapist or Wyatt's lifelong physician. The information the three doctors supplied cast doubt on the accuracy of the evaluation and reflected poorly on Convertino's diligence and objectivity.

The hearing was not scheduled to occur until December 19, 2012. This gave Convertino time to supplement her evaluation with critical information omitted from it, as well as to correct any errors she might have made in repeating the illogical speculation of unqualified persons, who did not know Leslie, to the effect she had Munchausen's syndrome by proxy or another serious mental condition. Correction seemed warranted, as Convertino had referred to Leslie's mental health 78 times in her report without making any serious inquiry of Leslie's own therapist, who was identified as Leslie's current therapist in Convertino's files.

Gereb and Howell had provided information that indicated a strong likelihood that Thomas, rather than Leslie, was responsible for the multiple injuries to Wyatt that likely

had caused the social worker to suspect Leslie suffered from Munchausen's syndrome by proxy, thereby discrediting the social worker's "diagnosis." Indeed, Gereb and Howell raised serious red flags about Thomas's attention to the safety of a special needs child with muscle weakness and clumsiness who arguably should not have been on a bicycle at age three and who had suffered a broken arm, blood in his stool, and a suspicious head injury within a four-month period while under Thomas's care.

Burr also had corrected Convertino's ill-founded and allegedly "skewed" conclusion in her evaluation that Leslie had "hit" or "struck" Thomas after he pushed her.

All of this was crucially important to the health, safety, welfare, and best interests of Wyatt, which were supposed to be Convertino's paramount concern.

Convertino could have provided a revision or addendum to her report in time for the December 19 hearing date. She was able timely to submit a "revised" report clarifying the identity of the social worker who raised the specter of Munchausen's syndrome by proxy and an "addendum" designed to accommodate Thomas's work schedule.

Instead, she claimed she could not add this important information to her substantive evaluation because it had been "submitted to the attorneys already." The California Rules of Court make clear that the child's health, safety, welfare, and best interests are of paramount concern. The rules say nothing about any inability to supplement a report that has been submitted to the attorneys. Indeed, the authority to supplement a report after it has gone to the attorneys seems implicit in the need to assure the best interests of the child are served when important new information becomes available or information included in a report already submitted proves unreliable. It was at least as important for Convertino to correct any errors or omissions she might have made than to add an addendum to accommodate Thomas's work schedule or to revise the evaluation to identify the person who mentioned Munchausen's syndrome by proxy.

In the November e-mails to the attorneys, Convertino's tone is piqued. She obviously is annoyed that Leslie caused other professionals to question her and highlight her reliance on weak sources of information when much stronger ones were available.

18

Convertino's characterization of Leslie as revealing the contents of a confidential evaluation to "whomever she chooses" is unfair. The three doctors to whom Leslie revealed the report were the most qualified witnesses to her mental status and Wyatt's injuries and appeared to have been misunderstood or misquoted. This is a far cry from revealing the evaluation to "whomever she chooses."

In her November 28 e-mail to the parties' attorneys, Convertino appears to stretch the truth in her own defense. She tells the attorneys Burr and Howell have contacted her "to argue and/or ask for changes in what they originally conveyed to me." Neither Burr nor Howell had asked her to "change" anything they had conveyed. They merely were attempting to correct Convertino's misstatements or misunderstandings.

Similarly, in the same e-mail Convertino defends herself from the accusation that she misquoted Gereb by saying she did not even interview Gereb. However, Gereb was not claiming Convertino had misquoted any oral statement. Rather, she was advising Convertino that she had misquoted Gereb's written *physician's note*.

Convertino's e-mailed statements to the attorneys that Leslie's breach of confidentiality should be reported to the trial court and her later statement that she "already has" reported it to the trial court also are problematical. First, the kind of communication Convertino appears to be referring to (a letter to the court) would be a prohibited ex parte communication under Family Code section 216, subdivision (a) and rule 5.235(c)–(f) of the California Rules of Court, unless there was a stipulation allowing such communications, which is not in the record before us.

Second, a report to the court of a party's breach of confidentiality is outside the prescribed scope of what an evaluator is charged with doing. Rule 5.220(h)(2) requires the evaluator to "[p]rotect the confidentiality of the parties and children in collateral contacts and not release information about the case to any individual except as authorized by the court or statute . . . ." This rule tells the evaluator not to violate confidentiality herself. It does not bestow authority to rouse the judge's ire against a party by reporting violations of the rules of confidentiality. When Convertino took it upon herself to notify

19

the trial court of Leslie's misconduct rather than leaving the matter to the attorneys, she stepped beyond her role as evaluator and into that of an advocate against Leslie.

The e-mails that underlie the November e-mails to the attorneys also reveal Convertino's bias. Convertino's contention in her e-mail to Burr that she had to put the reference to Munchausen's syndrome by proxy into the evaluation just because it was "brought up" was inconsistent with her role as evaluator. In that role, she was charged with protecting Wyatt. It was not in his best interests to report to the court unfounded speculation by unqualified individuals that was very harmful to Leslie just because it was brought up. As Burr noted, Convertino's professed conviction that she had to report every morsel of gossip, reliable or not, does not appear to have been applied evenhandedly. Convertino did not report Burr's negative comments about Thomas, even though they were brought up before the evaluation was completed. Moreover, Convertino did not trouble to correct her report to add them when they were brought up after the evaluation was submitted.

Convertino's response to Burr's November 5, 2012 e-mail also seems to have been disingenuous. Burr told Convertino that Leslie was concerned Convertino believed she had a "major mental illness diagnosis." Convertino responded, assuring Burr that Convertino was not "assigning any weight to claims of mental illness for Mrs. O[.] that have not been appropriately diagnosed by a professional in a manner consistent with best practices." However, two weeks later, that is exactly what Convertino appears to have done by mentioning Munchausen's syndrome by proxy and referring 78 times to Leslie's mental health issues without having discussed them substantively with Leslie's current therapist and after her current therapist had explained Thomas's characterization of Leslie as "bipolar" or "psycho" was only a product of his anger and that Leslie did not suffer from any severe mental illness.

In her e-mails with Burr, Convertino also seems to have been fishing for evidence that Leslie struck Thomas. Burr told her Leslie did not hit Thomas, but was only pushing him away after he had pushed her in an "escalating rage." Rather, Burr emphasized Leslie's relative passivity. In her evaluation, however, Convertino's reporting appears to

20

have been "skewed" to emphasize Leslie's "striking, pushing and shoving" Thomas and to underplay his aggression.

Her e-mails to Burr also suggest Convertino had lost her objectivity, so she was unable to appreciate or ignored the existence of evidence favorable to Leslie. She advised Burr that Leslie could not "continue in the manner that she has been with regard to her attitude and behaviors toward Mr. O[.] because there is no objective support for her positions." But in fact there was. Gereb complained to Convertino that her evaluation had misquoted Gereb's physician's note stating Wyatt was not wearing a helmet during the second accident in which he suffered a bump on his head inconsistent with wearing a helmet. Howell also took Convertino to task for raising the possibility that Leslie suffered from Munchausen's syndrome by proxy and for failing to appreciate the propriety of Leslie's multiple visits to doctors with Wyatt, as his significant injuries had been inflicted when he was under Thomas's care, not Leslie's. Howell further discredited Convertino's suggestion that Leslie suffered from Munchausen's syndrome by proxy by explaining Leslie was a highly competent nurse. Therefore, her level of knowledge of medical matters should not have raised a "red flag" to the social worker who associated such medical knowledge with Munchausen's syndrome by proxy. Convertino apparently was unable to see the doctors' "objective" and rather obvious support for Leslie's position that Wyatt's injuries resulted from Thomas's negligence and did not suggest she had Munchausen's syndrome by proxy.

In addition to showing bias and failing to retain focus on Wyatt's best interests, Convertino's dismissiveness with respect to the comments of Burr, Gereb, and Howell was inconsistent with the requirements that she "gather balanced information for both parties" (Cal. Rules of Court, rule 5.220(h)(1)); substantiate claims "from multiple sources when possible" (*id.*, rule 5.220(e)(2)); and consult "with other experts to develop information that is beyond the evaluator's scope of practice or area of expertise" (*id.*, rule 5.220(e)(2)(F)).

Finally, when Leslie asked Convertino if she was "advising Tom on specific matters," Convertino's response was, in effect, that she was helping Thomas to avoid

21

disclosing to Leslie something his lawyer might not want disclosed. In this way, Convertino inappropriately stepped out of her role as evaluator and into the role of guardian of Thomas's litigation interests. The record does not reveal any comparable efforts to protect Leslie's interests.

### 2. *E-mails between Convertino and Thomas*

Leslie contends the February 16 and 17, 2013 e-mails between Convertino and Thomas also show Convertino's bias.

Leslie's counsel argued at the hearing on her motion to remove the evaluator: "Somewhere the child custody evaluator and the parties being evaluated . . . developed into a different type of relationship. They were exchanging cozy little e-mails, conversations about the case, not about instructions about the case, not about setting appointments . . . . [¶] The e-mails make it very, very abundantly clear that the first evaluation had ceased. What was the purpose of an evaluator having any communication at all with someone where the evaluation had ceased? [¶] . . . Where is that sanctioned, condoned? I suggest it's not. In fact, somewhere in these e-mails she points that out."

Leslie's counsel made a good point. Convertino had finished her initial report and made clear she would not supplement or correct it unless and until she was formally retained to do so. Although she knew a supplemental report had been ordered, she did not know if she would be retained to do it. Thus, she did not have any job to do during the February 16 and 17, 2013 e-mails between her and Thomas.

One might argue that, since she had completed her evaluation in a manner favorable to Thomas, she was permitted to demonstrate she favored Thomas, as that was the natural consequence of having made the decisions she made in the evaluation. However, Convertino knew by February 17, 2013, that she might be retained to prepare a supplemental evaluation. She should not have allowed Thomas secretly to play on her sympathies in a way that created further bias and which might contaminate any supplemental evaluation she might be retained to prepare. Third, the evaluator's duties set forth in the California Rules of Court do not encompass the types of communications that occurred in February 2013 between Convertino and Thomas. The February e-mails

reveal an evaluator stepping outside her prescribed role to help one party at the expense of the other.

Moreover, Convertino's response to Thomas's February 16 e-mail did not advise him to cease communications with her. Nor did it request he cease the then-pointless criticisms of Leslie and apparent attempts to garner sympathy for his situation, both prominently featured in his February 16 e-mail. Instead, Convertino asked Thomas to keep communicating with her, to advise her how he wanted to proceed, and expressed her sympathy for his continued difficulties.

Convertino assumed the role of information provider, telling Thomas the status of his case without advising Leslie or her counsel she was doing so. The same information might not have been provided to Leslie. Convertino overstepped her authority and engaged in non-job-related and unauthorized ex parte communications helpful to Thomas.[7]

Thomas's February 17, 2013 e-mail to Convertino again complained about his attorney and Leslie, solicited sympathy for his situation, and reported he had confronted the social worker who had "diagnosed" Leslie with Munchausen's syndrome by proxy and expressed his disappointment at the social worker's failure to act on the diagnosis. It is difficult to detect any legitimate reason why Thomas would be making these statements to Convertino. Nonetheless, Convertino again failed to discourage his e-mails. Instead, she responded the same day with serious criticism of Thomas's attorney. She pointed out it was incomprehensible the attorney could be so uninformed and unprepared at the hearing, given that he was armed with her helpful evaluation well before the hearing. She advised Thomas to get a new attorney. Again, she stepped well beyond her authority by attempting to help and advise Thomas.

---

[7] Nor did she reveal the existence of her February 2013 e-mails with Thomas at the time she was engaged to prepare and preparing the supplemental evaluation, submitted in May 2013. They were only revealed to Leslie involuntarily via subpoena almost a year after the supplemental evaluation was finished.

23

She also made comments that seem to have no legitimate purpose, telling him how hard she worked and how balanced her evaluation was. She also continued to supply information about the legal process and volunteered to intervene with the attorneys to get the process moving along to alleviate Thomas's problems in a manner adverse to Leslie. These too were not the type of communications authorized by the applicable California Rules of Court.

In the same e-mail, Convertino revealed bias in favor of Thomas by saying, in effect, that she was on his side and had included in her evaluation things that should be helpful to him if his attorney will just do his job properly. ("I would truly like to see the right things done in your case but I can only say what I think those things should be. It is up to the attorney to take what I provide and bring that before the court in a compelling way.")

Picking up on Convertino's approval of his position, Thomas e-mailed her the next day saying how much he appreciated what she had done in the past and what she could contribute in the future. He asked for her help in supplying him with information as to "what's going on if you hear something." He also pointed out that her evaluation was so favorable to him that he and his friends had planned a victory party when they read it.

Again, instead of discouraging such flattery and expectations of future contributions, Convertino helped Thomas by informing him his attorney's performance did not meet community standards and advising him he needed a new attorney.

By May 2013, Convertino had been retained to prepare a supplemental report, to be submitted to the court. On May 9, 2013, Thomas apparently sought Convertino's assistance in connection with a visitation dispute he was having with Leslie, a role that is beyond the purview of an evaluator. Instead of advising Thomas to have the attorneys and the court work it out, Convertino revealed bias by expressing apparent sympathy for his position as contrasted to Leslie's. ("You made a reasonable offer to solve the problem.") She then appeared to promise to help him in the future by saying, "I will make more of that too." Finally, she encouraged him to keep her updated as to whether Leslie would allow a change in the visitation schedule.

24

Thomas contends this case is distinguishable from *In re Marriage of Adams & Jack A.*, *supra*, 209 Cal.App.4th 1543, because the facts in that case were more egregious than those here so *Adams* is thus distinguishable. Contrary to Thomas's argument, *Adams* does not establish a low watermark which dictates that only evaluators who fall below it should be disqualified and all others should be immunized from removal. We recognize that evaluation is an art rather than a science, and that different approaches may be required in different cases. Consequently, trial courts must consider the totality of the circumstances in deciding whether to remove an evaluator for bias. We caution that an evaluator whose conduct in one or two respects appears similar to Convertino's conduct here may not need to be removed. To hold otherwise and thus to endorse appellate micromanagement of every communication or act by the evaluator would make it impossible for evaluators to perform their very difficult and crucial functions.

Nonetheless, we conclude the trial court erred in failing to remove Convertino for bias against Leslie and to strike Convertino's evaluations, considering the totality of the circumstances. In light of our conclusion, we need not address the parties' remaining arguments.

## DISPOSITION

THEREFORE, let a peremptory writ of mandate issue, commanding respondent superior court to vacate its order of May 9, 2014, denying petitioner Leslie O.'s request for an order removing and disqualifying the child custody evaluator and striking the evaluation reports, and to issue a new and different order granting same, in Los Angeles Superior Court case No. PD054501.

The temporary stay order is hereby terminated.

Petitioner is awarded costs.

CERTIFIED FOR PUBLICATION.


MILLER, J.*

We concur:


ROTHSCHILD, P. J.


CHANEY, J.

---

**\*** Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.